J-S15003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: I.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 183 WDA 2021 |

Appeal from the Order Entered January 12, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000199-2019

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED:  JUNE 21, 2021**

A.C. (Mother) appeals from the trial court's order involuntarily terminating her parental rights to her minor son, I.B. (Child) (born 10/2017). After careful review, we affirm.

Mother gave birth to Child while she was incarcerated[1] for theft at Allegheny County Jail.  In October 2017, the Allegheny County Office of Children, Youth and Families (CYF) received a referral that Child had been exposed to drugs during Mother's pregnancy and that Mother was not able to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Upon her release from prison, Mother was scheduled to be discharged to a 90-day inpatient drug treatment program where she could not have custody of Child.  ***See*** N.T. Termination Hearing, 10/23/20, at 12.

care for Child after his birth.[2] Mother struggles with substance abuse[3] and has been under the supervision of the Drug Court throughout the pendency of this case. Mother and Father[4] met while Mother was prostituting; Father was Mother's client. Parents developed a friendship and, ultimately, became romantically involved. Father provided Mother with heroin or money, which she ultimately used to purchase drugs.

After his release from the hospital following his birth, Child was placed in Father's care. CYF received three additional referrals in November of 2017; CYF implemented crisis in-home services to Father after one of his friends fatally over-dosed in his home while Father was at work and Child was being cared for at a neighbor's home. In December of 2017, Child was removed from Father's custody after CYF received a referral that people were in Father's home under the influence of heroin with Child present. Child was placed in the care of his maternal grandfather and maternal aunt. After a shelter care

---

[2] Child was diagnosed with a sensory processing disorder when he was with his first foster family. N.T. Termination Hearing, 12/18/20, at 55.

[3] Doctor Neil Rosenblum, Ph.D., an expert in psychology, diagnosed Mother with unspecified bipolar disorder, borderline personality disorder, an unspecified eating disorder, as well as dysthymic disorder, a persistent depressive disorder that is common in persons who have a continued pervasive pattern of moderate depression marked by low self-esteem, guilt, and difficulty sustaining or generating a pattern of more successful functioning or interaction with other people. *See* N.T. Termination Hearing, 10/23/20, at 40-42.

[4] Father has filed a separate appeal, at 136 WDA 2021, contesting the termination of his parental rights pursuant to 23 Pa.C.S. §§ 2511(a) and (b).

hearing, the court ordered Child to remain in maternal grandfather's care and permitted Parents to have supervised visits with Child. On January 4, 2018, Child was removed from maternal grandfather's care and placed in a foster home after CYF received a report that Father had unsupervised contact with Child.[5] Child was adjudicated dependent on January 16, 2018.[6]

On November 7, 2019, CYF filed a petition to involuntarily terminate Mother's parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). While Mother was found to be in substantial compliance with her Plan goals at a September 22, 2020, permanency hearing, she later tested positive[7] for Fentanyl in October of 2020, and was reincarcerated. N.T. Termination Hearing, 12/18/20, at 117, 133.

Termination hearings took place on October 23, 2020, and December 18, 2020.[8] Doctor Rosenblum, CYF Caseworker Justin Jordan, Family Support

---

[5] Child was placed in his current foster home, also a pre-adoptive resource, on December 6, 2019. *See* N.T. Termination Hearing, 12/18/20, at 23.

[6] In April 2018, CYF set the following family plan goals (Plan) for Mother: address alcohol and drug issues; set boundaries with Father; and attend visits with Child. *See* N.T. Termination Hearing, 12/18/20, at 25. CYF later added the goals of locating independent housing, gaining employment, and addressing mental health issues to Mother's Plan. *Id.*

[7] Although the drug screen was conducted on September 21, 2020, the results were not received until October 6, 2020. *Id.* at 116-17.

[8] Mother participated remotely from the Allegheny County jail at the October 2020 hearing, and from an inpatient treatment facility for the December 2020 hearing.

Specialist Kirk Thoma, Foster Care Specialist Kristina Scott, Allegheny County Adult Probation Officer Ryan McConnell, Mother, and Father testified[9] at the hearings.[10]  At the time of the second termination hearing, Mother was in the process of transitioning from an inpatient facility to a half-way house.  **See** N.T. Termination Hearing, 12/18/20, at 127.  Mother testified at the hearing that because Child was removed from her at birth, she has "never had enough time with him to bond[.]" **Id.**

On January 12, 2020, the trial court entered an order terminating Mother's parental rights pursuant to sections 2511(a)(2),[11] (5), and (b) of the Adoption Act.[12]  Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Mother presents one issue for our review:  "Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of

---

[9] Pittsburgh Police Narcotics and Vice Officer Louis Schweitzer also testified at the December termination hearing with regard to Father and his criminal drug charges.

[10] Child was represented by Courtney Potter, Esquire, at the termination hearings.  **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[11] Mother concedes "CYF [] clearly and convincingly establish[ed] threshold grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2)."  Appellant's Brief, at 13.

[12] 23 Pa.C.S. §§ 2101-2938.

[Mother's] parental rights would serve the needs and welfare of [Child,] pursuant to 23 Pa.C.S. § 2511(b)?" Appellant's Brief, at 6.

We review this claim according to our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).[13]

_____

[13] *In re Adoption of S.M.*, 816 A.2d 1117 (Pa. Super. 2003), our Court noted:

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well[-]established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*Id.* at 1122 (citations omitted).

On appeal, Mother contends that the trial court abused its discretion by concluding that termination of her parental rights would serve the needs and welfare of Child where "the trial court applied fault-based and comparative analyses in making [its] needs and welfare determination." *Id.* at 10. Specifically, Mother argues that the trial court incorrectly focused its section 2511(b) analysis on the effect that removing Child from his foster home would have on him, rather than "the emotional effect that termination would have on [Child]." *Id.* at 17-18.

Mother points to the following excerpt from the trial court's Rule 1925(a) opinion to support her claim:

> Based on Dr. Rosenblum's final report, it is apparent to this court that removing [C]hild from his current placement could have long[-]lasting harmful effects on him. [C]hild is in a safe, stable, pre-adoptive home. All of his needs are being met[,] and the foster parents have done an outstanding job working with services to promote [C]hild's development. [C]hild has developed a secure and primary attachment with his foster parents and is doing well.

Trial Court Opinion, 2/25/21, at 28. Mother argues that the trial court's focus on the nature of the care foster parents have given to Child, as well as Child's attachment to foster parents, was improper in analyzing termination under section 2511(b). We disagree.

Section 2511(b) provides:

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection[s] (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). This Court has stated that the focus under section 2511(b) is on the child, not the parent. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc).

The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). While "[s]ection 2511(b) does not explicitly require a bonding analysis[,]" a parent-child emotional bond, if any, "is a factor to be considered as part of [a court's] analysis. *In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018).

However,

in addition to a bond examination, **the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.** Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (emphasis added) (citations omitted).

Instantly, the record supports the trial court's determination that termination of Mother's parental rights serves the needs and welfare of Child under section 2511(b). While the trial court undoubtedly considered Mother's lack of compliance with her Plan goals, it did so in conjunction with analyzing

the developmental, physical, and emotional needs and welfare of Child. The record bears out that Mother has only been able to have three unsupervised visits with Child over the life of the matter, was re-incarcerated four times in the three years since Child's birth, and has overdosed two times (fall 2018 & summer 2019) since Child's birth. *See* N.T. Termination Hearing, 10/23/20, at 14-15, 53; *id.*, 12/18/20, at 37. Mother testified that she is "[o]bviously [] an addict." *Id.* at 131. Notably, at the time of the termination hearings, Child had been removed from Mother for three years. *Id.*, 10/23/20, at 15. *See In re G.M.S*, *supra* at 403 ("[I]t is beyond cavil that Mother's incapacity, and the likelihood that she will never remedy that incapacity, which she has conceded, is an important consideration when determining what is best for Child[].").

Additionally, the court considered what, if any, parent-child bond exists between Mother and Child. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship"). Specifically, Dr. Rosenblum testified that Child has no secure attachment to Mother, N.T. Termination Hearing, 12/18/20, at 52, Child has never looked to Mother as a caregiver figure, *id.*, and, other than having a feeling of "familiarity" with Mother, Child has never looked to her as someone who can protect him or upon whom he can rely "on a day-in/day-out basis." *Id.* at 52-53. Doctor Rosenblum noted that while Mother may love Child, *see In re B.J.Z.*, 207 A.3d 914, 924 (Pa. Super. 2019) ("A parent's own feelings

- 8 -

of love and affection for a child, alone, do not prevent termination of parental rights[.]"), Mother lacks the capacity "to truly feel empathy[,] concern and awareness" toward Child. N.T. Termination Hearing, 10/23/20, at 46. *See also id.* at 45 (Doctor Rosenblum testifying Mother "doesn't really relate to people" and that there is "just this prevailing neutral level of emotional functioning on [Mother's] part"). Doctor Rosenblum testified that Child "needs permanency [and] the opportunity to remain in a stable, consistent, safe[,] and supportive home environment," and that "[M]other is not at a point where she can provide that type of care for [Child]." *Id.* at 52. *See also In re K.M.*, *supra* at 791 (emotional needs and welfare of child includes "[i]ntangibles such as love, comfort, security, and stability"). Ultimately, Dr. Rosenblum opined that because Mother "is not at a point where she can function independently in a stable, drug-free setting on her own," it was his expert opinion that "a goal change to adoption is consistent with [Child's] needs and welfare." N.T. Termination Hearing, 10/23/20, at 52, 78. *See In re B.J.Z.*, *supra* at 922 (in cases where there is no evidence of bond between parent and child, it is reasonable to infer that no bond exists; extent of bond-effect analysis necessarily depends on circumstances of particular case) (citation omitted).

Moreover, both Dr. Rosenblum and CYF caseworker Jordan testified that Mother is caught up in a "cycle of relapse" or "vicious cycle" where she "does something to undo the progress that she's made and to set herself back." N.T. Termination Hearing, 12/18/20, at 38; *id.* at 42 (CYF caseworker testifying

Mother's main barrier has been her cycle of use, incarcerations, and inpatient stays); *id.*, at 116 (Mother's probation officer testifying "we are back at square one with [Mother] being an inpatient again"); *id.*, 10/23/20, at 29 (Doctor Rosenblum testifying "it wasn't too difficult to identify a pattern of self-defeating or self-destructive behavior on [Mother's] part"); *id.*, at 44 (Doctor Rosenblum testifying Mother consistently violates her probation and then is sent back to jail and treatment programs). Mother's ongoing self-destructive behavior is further support for the court's conclusion that Child's developmental, physical, and emotional needs would be best served by terminating Mother's parental rights under section 2511(b).

Finally, we also find that it was proper for the court, in analyzing termination under section 2511(b), to consider the secure attachment and bond Child has with his pre-adoptive foster parents, with whom he had lived for one year at the time of the termination hearings. *See In re Adoption of C.D.R.*, *supra*. Foster parents have been able to provide Child with the necessary therapies to significantly improve his ability to communicate, speak, and interact with others in light of his sensory processing disorder. *See* N.T. Termination Hearing, 12/18/20, at 56-58. Caseworker Jordan also testified that Child is "thriving" in his foster home, foster parents and Child have a strong bond, foster parents comfort Child when necessary, and foster parents and Child show each other mutual affection. *Id.* at 57-58. Finally, Caseworker Jordan testified that terminating Mother's parental rights would serve Child's needs and welfare where "[M]other has not been able to maintain

sobriety and show stability[,] . . . [which] is something that [Child] absolutely needs. He needs a routine [and] structure." ***Id.*** at 59.

Under such circumstances, we conclude that the court appropriately considered Mother's actions and Child's relationship with his foster parents in evaluating whether terminating Mother's parental rights would serve Child's needs and welfare. Accordingly, because the court's factual findings are supported in the record, the trial court neither abused its discretion nor committed an error of law. ***In re T.S.M.***, ***supra***.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/21/2021